**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

SMITH COUNTY EDUCATION    )
ASSOCIATION, DENISE HACKETT,  )
SHERON SILVEY, CONNIE MASSEY,  )
and DEBBIE FULTON,               )
                                 )
       **Plaintiffs,**         )
                                 )
   **v.**                     )     **No. 2:08-0076**
                                 )     **Judge Campbell**
SMITH COUNTY BOARD OF      )
EDUCATION,                 )
                                 )
       **Defendant.**        )

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

From November 30, 2010 to December 3, 2010, the Court held a bench trial in this case challenging the constitutionality of Defendant Smith County Board of Education's ("the School Board's" or "Board's") random drug testing policy. On January 26, 2011, the parties filed lengthy proposed findings of fact and conclusions of law.

Plaintiffs seek a declaration that the randomness component of the drug testing policy violates Smith County teachers' rights to be free from unreasonable searches under the Fourth Amendment to the United States and Tennessee Constitutions. They also seek an injunction which would prohibit further random drug testing under the policy.

Having reviewed the record, the exhibits received in evidence, and the testimony of the witnesses after considering their interests and demeanor, the Court hereby enters the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a)(1). In so doing, the Court finds that the 2007 drug policy at issue in this case violates the individual Plaintiffs' Fourth Amendment rights. However, the Court does not find that random drug testing of teachers

is unconstitutional *per se*, only that the policy in this case is unconstitutional because it lacks proper notice and is unreasonably implemented.

## I.  FINDINGS OF FACT[1]

### A.  Basic Background Facts

Plaintiffs are four Smith County public school teachers, Denise Hackett ("Ms. Hackett"), Sheron Silvey ("Ms. Silvey"), Connie Massey ("Ms. Massey") and Debbie Fulton ("Ms. Fulton"), each of whom has been subjected to random drug testing under the policy.   Also named as a Plaintiff is the teachers' professional employees' organization, the Smith County Education Association ("SCEA") which is authorized to represent and act on behalf of the professional employees of the Smith County School System regarding conditions of employment and professional services.  Ms. Hackett is the designated representative for the SCEA at Smith County High School.

The Defendant School Board which enacted the drug policy at issue in this case is responsible for managing and controlling all schools within the Smith County school system.  The School Board employs a Director of Schools who is responsible for oversight of the schools in the district.   During all times relevant to this dispute, the Director of Schools was Roger Lewis ("Director Lewis").

Smith County is a tight-knit, primarily rural community with a population of around 19,000 residents.  Although small, Smith County has produced two recipients of the Nobel Peace Prize: Cordell Hull (1945) and Albert Gore, Jr. (2007).

---

[1]Except where the Court discusses different testimony on a specific issue,  any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

There are nine public schools in the county, including two high schools and seven elementary schools. Approximately 300 teachers are employed by the Board to teach almost 3,000 students enrolled in the public schools.[2]

At trial, the focus of the testimony was on Smith County High School where each of the four individual Plaintiffs teaches. At that school, teachers generally teach six 45-50 minute classes a day, and have a one hour planning period. Class sizes range from approximately 20 to 30 students. The teachers are directly responsible for supervising the students in their classes and have designated posts for monitoring students as they move from one classroom to another.[3]

It obviously is not possible for teachers to see each of their students at all times to account for their safety. For example, during class changes at the high school, teachers who have posts in the hallway may not be able to see students who have gone into the classroom. Even the layout of a given classroom may prohibit constant observation, as in Ms. Massey's family and consumer sciences classroom where the view of three of the four operational kitchens cannot be seen from the teacher's desk because of a wall.

Nevertheless, and as all of the individual Plaintiff-teachers agree, teachers should be unimpaired and be mentally and physically able to respond promptly to any emergency of which they become aware. Though far from a daily occurrence for any particular teacher, there have been situations in the Smith County schools which called for quick and decisive action by a teacher. Just

<hr>

[2]An additional 100 or so individuals are employed in non-faculty positions, including maintenance, custodial, and kitchen workers. However, no claims are made in this case on those employees' behalf.

[3]Some evidence about the elementary schools was provided by Heather Brewer ("Ms. Brewer"), a second grade teacher at Union Heights Elementary School. Her testimony suggests that elementary school classes are smaller and that students generally remain in the same classroom throughout the day, except for lunch, or classes such as physical education, where the children move as a group and are accompanied by a teacher or another staff member.

by way of examples: Ms. Hackett drove a school van which caught fire, and once went to the aid of a bleeding student who fell out of a chair; Ms. Brewer had a child pass out in her classroom; and Ms. Silvey grabbed a student who appeared to be "high" and almost fell to the floor, verbally broke up a fight, and, on two or three occasions, tended to a student who suffered a seizure in the classroom.

## B. **Events Leading to, and Enactment of, the Drug Policy**

Like many communities, Smith County has seen a marked increase in the possession and use of illegal drugs over the years. Methamphetamine use is a serious problem in the county, and there is also a problem with the misuse of prescription drugs in Smith County. (Tr. Trans. 315-316).

There has never been a documented case where a Smith County public school teacher has been at work under the influence of either alcohol or illegal drugs. However, two distinct events involving teachers led to the enactment of the drug policy at issue in this case.

In October 1997, Ronnie Sykes ("Mr. Sykes"), a vocational agriculture teacher at Smith County High School was arrested after a search revealed assorted drug paraphernalia in his home. Mr. Sykes' arrest was covered by the media and, in particular, by the CARTHAGE COURIER, a local newspaper. Seven years later, in August 2004, Deanna Massey ("Ms. Massey"), a sixth grade teacher at Gordonsville Elementary School in Smith County, was arrested after the remnants of a methamphetamine lab were discovered in the basement of the home she shared with another. This arrest too generated extensive media coverage, not only by the CARTHAGE COURIER, but also by Nashville television stations. It was also the subject of much discussion in the local community.

On the heels of Ms. Massey's arrest, the School Board decided to implement a drug policy that would test teachers for the use of illegal drugs. As Director Lewis explained at trial, both he and the School Board believed that, in light of the Sykes and Massey incidents, there could be a drug

problem which affected Smith County teachers and something had to be done to deter the potential problem.[4]

The need for a drug policy was first presented to the School Board at its August 17, 2004 meeting. It was discussed in some form or fashion during each of the monthly school board meetings from August 2004 until December 2004. From the inception, the consensus of the board was that, to have a deterrent effect, any drug test would need to have a randomness component.

The School Board designated the responsibility for drafting the policy to its legal counsel, Jack Bellar. Variations of the policy were presented to the School Board during the fall of 2004.

The final version of the 2004 Policy was presented to the Board and unanimously approved at its December 21, 2004 meeting. (Tr. Ex. 9). The minutes of the Board meeting for that day indicate that the policy was to became effective for new hires on January 1, 2005, and "[r]andom testing will begin for existing employees July 21, 2005." (Id.).

Director Lewis was charged with the responsibility to "oversee the overall application of this policy." (Tr. Ex. 3, 2004 Policy, ¶ V C 1). At some point, each employee of the school district was provided with a copy of the policy and required to sign a form acknowledging that he or she had received a copy, understood the policy, and that he or she "consent[ed] to be tested for controlled substances and/or alcohol pursuant to the . . . policy." (Id. at p. 9).[5]

---

[4]Scotty Yeaman, who was on the School Board at the time, and who had previously been a high school teacher, coach, and Principal at Smith County High School echoed Director Lewis' concerns, testifying at trial that something needed to be done to "nip this in the bud." (Tr. Trans. at 488).

[5]The 2004 policy states that it was established under the Tennessee Drug-Free Workplace Act of 1988, Tenn. Code Ann. § 50–9-200 *et seq.* (Id. ¶ II D). Such workplace drug policies entitle an employer to a 5% reduction in their worker's compensation insurance contributions.

On its face, the 2004 policy applies to all School Board employees (including Board Members) and provides for testing under the following circumstances: (a) "job applicant drug testing"; (b) "reasonable suspicion drug or alcohol testing"; (c) "routine fitness-for-duty drug or alcohol testing"; (d) "follow-up drug or alcohol testing" and (e) "post-accident testing." (Id. at ¶¶ III C & IV B 2(a)-(e). Job applicants and employees are subject to "testing for alcohol, amphetamines, cannabinoids, cocaine, phencyclidine and opiates or any other substance prohibited by statute[.]" (Id. at ¶ IV B 2).

The five specific types of drugs identified in the 2004 Policy are the same drugs tested for in the five-panel drug testing procedure under Department of Transportation ("DOT") regulations. Indeed, that Policy provided that "as required by Department of Transportation regulations," all supervisors would receive at least two hours of training on alcohol abuses and the use of controlled substances. Additionally, the Policy provided that, under the Tennessee Drug-Free Workplace Act, all employees would receive one hour annual training on substance abuse in the workplace, and all supervisors would receive "a minimum of two (2) hours of workplace substance abuse recognition training per year." (Id. at ¶¶ IV C 2 & 3a – b).

Conspicuously absent from the 2004 Policy was any specific provision for random drug testing. The only explanation provided at trial for the absence of language relating to random drug testing was that there was some oversight in the drafting of the policy. Nevertheless it is clear from the evidence that the Board intended that the policy contain a randomness component and, beginning in the fall of 2005, the School Board began randomly testing 10% of its employees (including teachers) per year.

The 2004 Policy provided that its provisions were "subject to any applicable collective bargaining agreement or contract and includes the right of appeal to the applicable court." (Id. ¶ IV E 10). During collective bargaining negotiations between the SCEA and the Board in 2007, it was brought to the School Board's attention that the 2004 Policy had no specific language authorizing random drug testing. Accordingly, the Board at its September 25, 2007 meeting "approve[d] revisions to clarify the current Drug Free Workplace Policy." (Tr. Ex. 16 at 4).

The 2007 Policy, which is the operative policy at issue in this case, is virtually identical to the 2004 Policy with three notable exceptions. First, new language was added providing that all employees of the school district would be subject to random drug testing. (Tr. Ex. 4, 2007 Policy, ¶ III C). Second, a new paragraph was added which provided that "[i]t is the policy of the Smith County Board of Education to randomly test at least ten (10%) percent of its employees annually." (Id. ¶ III D). Third, the reference to the Policy being subject to the collective bargaining agreement was removed.

## C. Implementation and the Drug Testing Procedures

The School Board contracted with Fortier Substance Abuse Testing, Inc. ("Fortier") to implement its drug testing program. In implementing the program, the School Board deferred to Fortier's expertise[6] in relation to the types of drugs which would be subject to testing. Indeed, the evidence at trial made clear that the School Board, while desiring that employees be tested, had no

---

[6]Fortier's business focuses on managing drug testing programs for employers. In that role it provides a variety of services, including the formulation of programs, training of employees, and collection of samples. It also contracts with Substance Abuse and Mental Health Administration ("SAMSHA") certified laboratories to test samples, and contracts with Medical Review Officers ("MROs") to review positive test results.

clear idea of what types of drugs should be looked for and that, even to this day, some members are not aware of the specifics in relation to which drugs are included in testing.

The program developed by Fortier for the School Board provided that employees would be subjected to a nine-panel urine test. This meant that, in addition to the categories of drugs in the five-panel DOT test, and specifically named in the policy, employees' urine would also be tested for the presence of benzodiazepines, barbiturates, propoxyphene, and methadone. The additional categories of drugs include commonly prescribed medications such as Xanax® (alprazolam), a benzodiazepine. While there are DOT regulations which provide for specific cut-offs (meaning that a concentration of drug metabolites under a specified amount produces a negative result) in the five panel DOT test, there are no such DOT cut-offs for the additional four drugs in the nine-panel test. Nevertheless, SAMSHA-certified labs utilize some cut-off levels for those drugs. The 2007 Policy is silent as to cut-offs.

The primary contact between the Board and Fortier is Kelsey Unland ("Ms. Unland"). Ms. Unland is a DOT Certified Professional Collector and Trainer. Since the inception of the program Ms. Unland has conducted the supervisor and employee training for Defendant's employees and collected the urine samples. The training is conducted at an in-service session before the start of the school year. The scope of the training, however, is open to some dispute.

According to the slides used by Ms. Unland which were presented at trial, employees are generally informed about the Tennessee Drug-Free Workplace Program, the salutary effects of a drug free workplace, the names of various drugs, a listing of drugs in the five-panel and nine-panel tests, and the assorted effects of depressants, stimulants, relaxants, and hallucinogens. (Tr. Ex. 19).

Employees are also informed that use of prescribed drugs for which the script is more than a year old can lead to a positive result.

The slides utilized during some presentations, however, do not show that the teachers are specifically informed about the types of drugs subject to testing. (Id.). Other slides, such as those used during the 2009-2010 school year presentation, indicate the nine-categories of drugs tested, but do not list the brand name of those drugs. (Tr. Ex. 21).

Further, the slides utilized during training indicate that random testing will not occur. One slide, used during a presentation at an unknown date, provided that "Required Testing" included pre-employment, post-accident, fitness for duty, follow-up and reasonable suspicion testing, but that "*Random Testing is NOT Required.*" (Id. at p. 3, emphasis and italics in original). A slide utilized during supervisor training on an unknown date lists the required testing but also states, "Notice: Random testing is not required." (Tr. Ex. 20 at 2). Similarly, during the 2009-2010 employee training, the teachers were shown a slide which presented the question, "When will I be tested?" and then listed various circumstances, but concluded with the statement, "Random (not required)." (Tr. Ex. 21 at 3). The supervisor training during the same period contains a slide which lists the "required tests," but no mention is made of random drug testing as being one of those tests. (Tr. Ex. 23 at 3). Even the slides utilized for this school year list the "required tests," but do not include "random" as being one of them. (Tr. Ex. 29 at 3).[7]

Random drug testing at the Smith County public schools occurs twice a year – five percent of the employees are tested in the fall, and five percent in the spring. Fortier uses a computer

---

[7]Random testing was suspended pending resolution of this case.

program to randomly select the names of those to be tested from a list of employee names provided by the school district.

Some employees have been tested more than others. For example, Ms. Hackett and Ms. Massey have been tested twice, and Ms. Silvey has been tested three times. However, this is the result of nothing more than chance because all employees' names go into the hopper for possible selection, regardless of whether they have been tested in the past. Individual teachers have not been targeted for testing.

On the day selected for testing, Ms. Unland meets Director Lewis at his office and the two travel together to the various schools in the county where the selected teachers work. At each school, there is a designated area set aside for the testing. Thus, at Smith County High School, a conference room with an attached bathroom is used for testing, while the nurse's clinic at Union Heights is used. If a teacher is not at school, he or she may be directed to go to the local hospital for testing, as Ms. Massey was when she was away from the high school on a field trip and told to report to the hospital the next day for testing.[8]

Upon arrival at a given school, Ms. Unland sets up in the designated testing site. This includes placing a blueing agent in the toilet water, and taping the faucets and toilet so that the urine sample cannot be diluted.

Director Lewis gives the school principal the list of the randomly-chosen names of the teachers to be tested. The school principal then informs the teachers that they have been selected

---

[8]Even a teacher on leave is subject to testing, For example, Ms. Brewer was instructed to go to her school in February 2008 for testing, even though she was on maternity leave and had nine weeks of that leave remaining. (Tr. Trans. at 391-92).

for random testing and directs them to the testing area.  If a teacher is responsible for a class at the time of testing, the principal or another teacher takes over that class.

Generally, when the teacher reports for testing, only Ms. Unland is in the designated room.  After confirming the teacher's identity, Ms. Unland breaks open a package which contains the sample cup and two vials.  The teacher then goes into the bathroom alone to produce the sample.  Upon completion, Ms. Unland is given the sample and she splits it into two vials, with the first to be used for testing, and the second to be used for confirmation, if necessary.  The vials are then sealed and the teacher signs a form which indicates that the samples are hers and initials two strips which are placed over the vials.  The teacher is then free to leave, although she must wash her hands in some other restroom at the school because the faucets in the bathroom are taped.[9]

There have been occasions when more than one person has been present in the conference room at Smith County High School during testing.  This can occur when a teacher is unable to produce a sample and must sit around the table drinking water until he or she is able to provide the sample.  The teachers involved found this to be invasive.  The weight of the evidence also indicates Ms. Unland has split samples in front of others waiting their turn in the conference room.

During testing, Director Lewis remains in the school, although he is not in the testing room.  On several occasions he has been seen by teachers selected for testing, and some find his presence intimidating.  However, Director Lewis claims he is not at the school to intimidate, but rather is there in case a situation arises which requires his attention, such as if a teacher refuses to be tested.

---

[9]There was some testimony that, at times, the faucets were untaped for use after samples were collected.

Moreover, Director Lewis often visits the schools in his district and, in fact, goes to the Smith County High School two or three times a week.

At the conclusion of the testing day, Ms. Unland returns to her office and the samples are picked up by a courier for delivery to a SAMSHA lab. When conducting the tests, the lab has no way of knowing the donor's identity because the label on the vial only contains initials and a number. If a sample tests positive, the results are sent to an MRO for review.

The MRO for all of the tests to date has been Dr. Gilbert Woodall ("Dr. Woodall"), a board certified occupational health physician. When Dr. Woodall receives a positive test result from the laboratory, he contacts the donor to inquire about any prescription medications the donor may be taking. If the prescription medication appears to be the basis for the positive result, Dr. Woodall changes the test result to negative.

Since the inception of the random drug testing program in Smith County, there have been no confirmed positive test results for any Smith County school teacher. Nevertheless, the testing procedure has been unsettling to some teachers who, like the Plaintiffs in this case, take prescribed medications and are fearful that those medications, though lawful, will lead to a positive test result.

**D. Expert Witness Testimony**

During the course of the trial, the Court heard the testimony of three expert witnesses regarding the validity of drug testing results, the possibility of error in such tests, and the deterrent effect of drug testing in the workplace. On certain issues, those witnesses had markedly different expert opinions.

Dr. Warren J. Woodford ("Dr. Woodford"), who testified for Plaintiffs, has a doctorate of philosophy in chemistry and is a medicinal chemist who has studied the effects of drugs and alcohol

on the body from a pharmacological, toxicological, and chemical perspective. He has performed drug testing for many law enforcement agencies, ran a DEA drug testing laboratory, and has undergone MRO training, though he is not an MRO.

Dr. Woodford is of the opinion that the way the Smith County drug testing is written is "very risky" because of the possibility of false positive results and that random drug testing has "lots of room for error" and is not considered conclusive. (Tr. Trans. at 183). He also believes that the error rate in drug testing "skyrockets" where, as here, a drug policy proscribes illegal drugs "in any detectable amount." (Id. at 184). In this regard, commonly consumed items have trace amounts of drugs, such as the opiates found in poppy seed bagels or poppy seed oil. Further, some over-the-counter medicines contain ingredients that can lead to a positive test result, such as a Vicks Inhaler® which, at least until recently, contained amphetamine which can lead to a positive result for methamphetamine use. Dr. Woodford is unfamiliar with the laboratories used by Fortier in this case or the cut-off level those laboratories employed.

Dr. Linn Goldberg ("Dr. Goldberg"), who also testified for Plaintiffs, is a Professor of Medicine and head of Health Promotion and Sports Medicine at Oregon Health Sciences University. He is board certified in internal medicine and a Diplomate of the National Board of Medical Examiners. Dr. Goldberg has extensive experience in drug testing, and served five years as an Olympic doping officer. In that role he tested athletes and did urine collections. In addition to being a research scientist who has overseen approximately $30 million in grants from the National Institute of Health, he has an active internal and sports medicine practice.

Dr. Goldberg believes there is no substantial evidence that random drug testing is a deterrent to illegal drug use. As support, Dr. Goldberg relies, in part, on his role as the principal investigator

of the Student Athlete Testing Using Random Notification Study ("SATURN") which assessed the results of random drug and alcohol testing on high school athletes. The SATURN study showed that random drug testing on such students evidenced no deterrent effect on past month drug use.

In formulating his opinion, Dr. Goldberg recognized studies which suggest a correlation between random drug testing in the workplace and the avoidance of such places by those who use illegal substances. For example, in a study sponsored by SAMSHA titled *Worker Substance Use and Workplace Policies and Programs* authored by Sharon L. Larson *et al.* ("the Larson report"), researchers opined "that those who use illicit drugs are less likely to report working for employers who have a drug-testing program compared with workers who do not use illicit drugs." (Tr. Ex. 32 at 65). However, such studies are not conclusive on the issue of deterrence in Dr. Goldberg's view, as evidenced by the Larson report itself, which shows that Asians are subject to random drug testing in the workplace less often than whites (17.4% versus 28.3%), yet white workers, by their own admission, are four times more likely to have used illicit drugs in the past month (8.8% versus 2.2%). (Id. at 12). This is not something Dr. Goldberg would expect if the specter of random drug testing actually served as a deterrent.

Overall, Dr. Goldberg is of the opinion that the Smith County random drug policy does not serve as a deterrent. Aside from his view that there is no conclusive evidence that random drug testing is effective, he stated that the number of employees tested (10%) in Smith County is simply too low. Moreover, as even the Larson report shows, drug use varies markedly among various demographics. Females are less likely than males to use illegal drugs (6.2% versus 9.7%,); those under 25 are almost twice as likely as those over 25 to use illegal drugs (19% versus 10.3%); college educated employees are half as likely as those without a high school diploma to use illegal drugs

(5.7% versus 11.2%); and educators are among the least likely of all occupational groups to use illegal drugs (4.1%). (Id. at 12 & 23). Since all teachers in the Smith County Schools are educators with a college degree, and most are female and over 25, Dr. Goldberg believes there is little deterrence in drug testing such individuals because it is unlikely that they are using illegal substances in the first place.

Dr. Robert Swotinsky ("Dr. Swotinsky") was called as an expert witness by the Defendants. He is a physician, board certified in occupational medicine, and has a Masters of Public Health degree, with a specialty in epidemiology. Up until recently, Dr. Swotinsky was the Chair of Occupational Medicine at the Fallon Clinic in Worcester, Massachusetts, where he supervised thirty occupational health professionals. He is still employed by the Fallon Clinic, which provides drug tests and other occupational health services to thousands of employers. Additionally, Dr. Swotinsky is a certified substance abuse professional and the MRO for programs which encompass more than 8,000 workplace drug tests a year.

In addition to his practice, Dr. Swotinsky has trained thousands of physicians in the area of workplace drug and alcohol testing and written extensively on those topics. Aside from writing a monthly newsletter about workplace drug and alcohol testing for the American College of Occupational and Environmental Medicine, Dr. Swotinsky is the author of the MEDICAL REVIEW OFFICER'S MANUAL which is presently in its fourth edition.

Dr. Swotinsky is of the opinion that drug testing is an exact science and that there essentially are no false-positives. SAMSHA-certified laboratories are repeatedly tested to insure accuracy, including blind testing by the laboratories, their clients, and a regulatory agency. In the past twenty years some 100 million specimens have been tested in certified laboratories, and there have been no

false positives, except for three or four false positives in 1990, when ephedrine tested positive for methamphetamine because of the high temperatures in the gas chromatography/mass spectrometry device. That problem was promptly identified and corrected, and it has not recurred. (Tr. Trans. at 548; Tr. Ex. 18 at 2-3).

Dr. Swotinsky also believes that passive exposure to drugs, "spiked" food or drink, and/or the use of over-the-counter medications will not lead to positive test results. Studies show that passive exposure, including contact with people using cocaine, methamphetamine, or marijuana, will not result in a positive test result because testing cut-offs report concentrations "that are much higher than even the most intensive passive exposure could cause." (Tr. Ex. 18 at 4). As for spiked food or drink, Dr. Swotinsky, despite his extensive experience in the field, is unaware of any reports where a person has tested positive on a drug test because of ingesting such items. (Id. at 5).[10] With regard to over-the-counter medications, any positive result in the initial screening would be changed to a negative result because of subsequent confirmation testing. Through such testing, for example, a user of a Vicks Inhaler® would not receive a confirmed positive test for methamphetamine use because MROs are trained to distinguish the D (drug) isomer found in methamphetamine from the L (legal) isomer found in an inhaler. (Id.).

Dr. Swotinsky has some "quibbles" with the Smith County drug policy and its implementation, including samples being separated in front of others, and the fact that only 5% of employees are tested twice a year. Overall, however, he is of the opinion that the policies and

_____

[10]Dr. Woodford's suggestion in his expert report that a student could cause a positive test result for a teacher by dipping a dollar bill in the teacher's drink is, in Dr. Swotinsky's opinion, a scenario that "is bizarre, speculative, and contrary to the scientific literature," given the published data which shows that "dollar bills that are contaminated with cocaine have amounts thousands of times lower than a typical recreational dose of cocaine." (Id.).

procedures utilized insure the integrity of the specimen, the anonymity of the donor, and the accuracy of the results because Fortier utilizes collections procedures which are recognized by DOT regulations.

Dr. Swotinsky believes workplace drug testing "keeps people honest" and deters drug use, and that random testing fosters achievement of that goal. This remains so even though educators have a 4.1% rate of illegal drug use, since this figure means approximately one in twenty-five use illicit drugs. (Trans. at 555, Tr, Ex. 18 at 10 & 11).

In Dr. Swotinsky's view, "random testing is the most effective drug deterrence method because it places current employees on notice that they are subject to testing at any time while at work." (Tr. Ex. 18 at 10). Both reasonable suspicion and pre-employment testing are of less efficacy in deterring drug use. Reasonable suspicion testing is confrontational and therefore may be avoided by supervisors who, in any event, may not be able to recognize that someone is impaired by an illegal drug, particularly since users become tolerant of the drug and may not show any obvious signs of use. Pre-employment testing is of questionable value because prospective employees can simply stop taking drugs just before the test. (Id.). Dr. Swotinsky's opinion in this regard is supported by the Larson report which indicates that substance abusers are less likely to work for an employer who has a random drug testing policy than they are to work for an employer that has only a pre-hire testing policy (22.6% versus 34.6%), and those who use illegal drugs are less likely to work for an employer who randomly tests for drugs, than are employees who do not use illegal drugs (22.6% v. 29.8%). (Tr. Ex. 32 at 58).

As for testing for prescription drug use, Dr. Swotinsky stated that there are no definitive studies which suggest an increased risk of work related accidents from the use of prescription drugs

and that testing for such drugs may not be beneficial in terms of the increased costs. (Tr. Trans. at 589 & 595; Tr. Ex. 40). Still, in his professional opinion, those considering enacting a drug policy need to make a "judgment call" about testing for prescription drugs because it may serve the purpose of deterring unlawful prescription drug use. (Tr. Trans. 589). That is, while using lawfully prescribed drugs is not the same as using heroin, for example, prescription drugs can be used in "unapproved ways." (Id.. at 598).

Having carefully considered the expert testimony and all the evidence introduced at trial, the Court finds that random drug testing clearly serves as a deterrent to illegal drug use. Random testing deters the use of drugs that are illegal *per se* as well as prescription drugs that are acquired illegally.

The Court further finds that the procedures actually utilized by Fortier in this case, including the collection, testing and confirmation process, render the possibility of a false-positive result reasonably nonexistent.

However, the 2007 Policy raises other constitutional concerns. The 2007 Policy lacks clarity and does not give teachers reasonable and adequate notice of what is being tested. The policy is also implemented in such a way that it unreasonably intrudes on the privacy of teachers.

## II. CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 655 (1961), provides, in relevant part, that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizure shall not be violated[.]" U.S. Const. amend. IV. Similarly, Article I Section 7 of the Tennessee Constitution provides, in pertinent part, "that the people shall be secure in their persons . . . from unreasonable searches and seizures[.]" Tenn. Const.

art. I, § 7.  The intent and purpose of the prohibition against unreasonable searches is the same in both the federal and state constitutions.  State v. Simpson, 986 S.W.2d 776, 779 (Tenn. 1998).

A compelled urine test from a governmental employee is a search for purposes of the "unreasonable searches and seizures" clause of the Fourth Amendment.  Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 617 (1989).  Indeed, "drug or alcohol testing of a governmental employee implicates the Fourth Amendment even though the testing may not be related to enforcement of the criminal law." Pennington v. Metro. Govt. of Nashville, 511 F.3d 647, 651 (6th Cir. 2008).  Because such testing intrudes on an individual's expectation of privacy, drug or alcohol testing of governmental employees generally must be based upon individualized suspicion to be considered reasonable under the Fourth Amendment.  Chandler v. Miller, 520 U.S. 305, 313 (1995).

A notable exception to the general rule and its application by the Sixth Circuit is central to this case.  The Supreme Court has held that suspicionless drug testing can be constitutional when it "serves special government needs."  One such special need may exist when the employee holds a "safety sensitive" position, meaning that the employee's duties are "so fraught with . . .  risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Skinner, 489 U.S. at 628.   In such circumstances, courts must "balance the individual's privacy expectations against the government's interest to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665-66 (1989).

The Sixth Circuit applied the foregoing jurisprudence to a drug policy implemented by a Tennessee school board in Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361

(6th Cir. 1998).  Because that decision serves as a backdrop for analysis and is controlling law on certain issues in this case, the Court addresses it in some detail.

In <u>Knox County</u>, teachers and other school employees challenged, on Fourth Amendment grounds, a 1994 school board policy which provided for (1) suspicionless drug and alcohol testing of employees applying for "safety sensitive positions," and (2) reasonable suspicion drug and alcohol testing for all employees.   The trial court found the policy unconstitutional insofar as it provided for suspicionless drug testing, but constitutional insofar as it allowed for reasonable suspicion drug testing.

With respect to the claim pertinent to this case – suspicionless drug testing –  the Sixth Circuit reversed the district court.  In doing so, the Sixth Circuit began by noting that while a search generally must be based upon an individualized suspicion of wrongdoing, a suspicionless drug test can be constitutional where the government's or public's interest in testing outweighs the individual's privacy interest.  Ultimately, the Sixth Circuit found that the balance tipped in favor of the school board.

As for the public interest in testing, the Sixth Circuit noted that, just as in this case, there was "little, if any, evidence of a pronounced drug or alcohol abuse problem among [the county's] teachers or other professional employees."  <u>Id</u>. at 374.  However, the court went on to write that "a pronounced drug problem is not a *sine qua non* for a constitutional suspicionless drug program," that a teacher's role was "unique," and that this uniqueness was "great enough to overcome the presumption against suspicionless testing."  <u>Id</u>. at 374 & 375.

According to the Sixth Circuit, the "unique" role of teachers is codified in Tennessee because teachers serve "in an *in loco parentis* capacity and are charged with the responsibility 'to secure

order and to protect students from harm while in their custody.'" Id. at 375 (quoting Tenn. Code

Ann. § 46-6-4203(b)). Statutory provisions aside, the Sixth Circuit observed that the communal

expectation is that teachers will care for students entrusted to their care:

> . . . We can imagine few governmental interests more important to a community than
> that of insuring the safety and security of its children while they are entrusted to the
> care of teachers and administrators. Concomitant with this governmental interest
> is the community's interest in reasonably insuring that those who are entrusted with
> the care of our children will not be inclined to influence children – either directly or
> by example – in the direction of illegal and dangerous activities which undermine
> values which parents attempt to instill in children in the home. Indeed, teachers
> occupy a singularly critical and unique role in our society in that for a great portion
> of a child's life, they occupy a position of immense direct influence on a child, with
> the potential for both good and bad. Teachers and administrators are not simply role
> models for children (although we would certainly hope they would be that). Through
> their own conduct and daily direct interaction with children, they influence and mold
> the perceptions, and thoughts and values of children. Teachers and administrators
> are not some distant societal role models, . . . rather, on a daily basis, there is a direct
> nexus between the jobs of teachers and administrators and the influence they exert
> upon the children who are in their charge. Indeed, directly influencing children is
> their job.

Id. at 374-375.

Because teachers serve in an *in loco parentis* capacity while in charge of students, the Sixth

Circuit in Knox County believed that the potential for harm through illegal drug use was heightened.

In this regard, the court concluded that teachers are in "safety sensitive" positions. Admittedly, this

was an expansion of the group of employees classified as such by the Supreme Court, including

railroad employees, Skinner, 489 U.S. 602, and custom agents who have direct contact with drug

traffickers or carry firearms, Von Raab, 489 U.S. 656, but:

> . . . we do not read the definition of "safety-sensitive" so narrowly as to preclude
> application to a group of professionals to whom we entrust young children for a
> prolonged period of time on a daily basis. Simple common sense and experience with
> life tells us "that even a momentary lapse of attention can have disastrous
> consequences," . . . particularly if that inattention or lapse were to come at an
> inopportune moment. . . . For example, young children could cause harm to

themselves or others while playing at recess, eating lunch in the cafeteria (if for example, they began choking), or simply while horsing around with each other. Children, especially younger children, are active, unpredictable, and in need of constant attention and supervision. Even momentary inattention or delay in dealing with a potentially or dangerous emergency situation could have grievous consequences.

Id. at 378 (internal citations omitted).

Finally, the Sixth Circuit in Knox County considered the harm to the teachers in suspicionless drug testing but discounted that harm because, as a whole, the regime was "fairly circumscribed and unintrusive." Id. at 380. Under the policy, individual privacy was assured because the samples were given in private (unless there was cause to believe tampering might occur), positive tests results were retested, and an MRO reviewed positive tests before they were forwarded to the school board. Moreover, a teacher's expectation of privacy was diminished from most other employees because the profession is highly regulated and, "[t]herefore teachers must expect that with [their] extraordinary responsibility, they will be subject to scrutiny to which other civil servants or professionals might not be subjected, including drug testing." Id. at 384.

The Knox County decision was written with broad strokes. It speaks of "school teachers," and teachers in Tennessee, not just Knox County teachers. In this regard, the Sixth Circuit observation that Tenn. Code Ann. 46-6-4203(b) dictates that teachers stand in an *in loco parentis* capacity to their students applies as equally to the teachers in Smith County as it does to their counter-parts in Knox County, just as the other state regulations governing teachers and referenced in the Knox County case apply to all teachers in this state. Further, the language about the role of teachers *vis-a-vis* their occupying a "safety-sensitive" position is applicable to all public school teachers in this state.

Plaintiffs have presented no evidence which suggests that the teachers' roles in Smith County are markedly different than those of Knox County teachers. The evidence before the Court suggests that the duties they perform are virtually the same. For example, in <u>Knox County</u>, the Sixth Circuit indicated that the high school teachers generally teach classes for six hours each day and when not teaching (or preparing to do so), they monitor the hallways when students are changing classes. <u>Id</u>. at 364. This is remarkably similar to the individual Plaintiffs' portrayal of a school day at Smith County High School. Further, and similar to the testimony provided by Ms. Brewer in this case, Knox County elementary teachers spend most of the day with the same children in a classroom, and monitor their charges when they are in the hallways going to places such as the cafeteria.

Given the sweep of the language in <u>Knox County</u>, and the absence of any evidence that the teachers in this case perform roles which are different in any significant way from those of the Knox County teachers, the Court is bound by the Sixth Circuit conclusion that teachers in Tennessee, including the individual Plaintiffs in this case, stand *in loco parentis* to their students, and occupy "safety sensitive" positions. In any event, based upon the evidence presented at trial, the Court finds that the teachers in Smith County hold "safety sensitive" positions. That said, the decision in <u>Knox County</u> is also important in this case for what it does not hold.

The key issue in <u>Knox County</u> (so far as relevant to this case) was suspicionless drug testing of applicants who apply for a teaching position and teachers already in the system who seek a promotion or transfer to another position. Truly random testing of teachers, as in the case here, was not an issue. This was significant in terms of the Sixth Circuit's holding that Knox County's drug policy was constitutional.

On at least three occasions, the Sixth Circuit pointedly observed that the issue of random testing was not before it. In finding the Knox County "drug testing regime" not overly intrusive, the Sixth Circuit wrote:

> . . . It *does not include a random testing component*, and only tests those people who are candidates for, and attempting to transfer to, a select group of positions. There is *no ongoing testing once an applicant has received the job* and passed the initial test.

Id. at 380 (emphasis added). Further, in the penultimate paragraph of the opinion dealing with suspicionless testing, the Sixth Circuit defined the precise question before it as follows:

> . . . The ultimate inquiry before the Court is whether the search at issue here – *the one-time, suspicionless testing of people hired to serve in teaching and administrative positions* – is reasonable. On balance, the public interest in attempting to ensure that school teachers perform their jobs unimpaired is evident, considering their unique *in loco parentis* obligations and their immense influence over students. These public interests clearly outweigh the privacy interests of the teacher not to be tested because *the drug-testing regime adopted by Knox County is circumscribed, narrowly-tailored, and not overly intrusive, either in its monitoring procedures or in its disclosure requirements. This is particularly so because it is a one-time test, with advance notice and with no random testing component,* and because the school system in which the employees work is heavily regulated, particularly as to drug usage.

Id. at 384 (emphasis added).

Other courts also have recognized the difference between ongoing, random drug testing, and suspicionless drug testing based on a triggering event, including the Supreme Court in Von Raab. There, the Supreme Court upheld suspicionless drug testing for customs officers, but noted even that type of testing "undoubtedly infringe[s] some privacy expectations." Von Raab, 489 U.S. at 672. Nevertheless, the drug testing regime did "not carry the grave potential for 'arbitrary and oppressive interference with privacy and personal security of individuals,'" because there was no randomness component:

> [The] procedures significantly minimize the program's intrusion on privacy interests. Only employees who have been tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions. Employees are also notified in advance of the scheduled sample collection, thus reducing to a minimum any "unsettling show of authority" . . . that may be associated with unexpected intrusions on privacy.

Von Raab, 489 U.S. 656, 672 & n.2 (citations omitted).

Accepting that there is difference in the law between suspicionless searches based on a triggering event and truly random suspicionless searches, but also recognizing that (even post – Knox County) random drug testing of governmental employees is not *per se* unconstitutional under prevailing Sixth Circuit law, see Int'l Union v. Winters, 385 F.3d 1003, 1014 (6th Cir. 2004), the Court turns to whether the Smith County policy is unconstitutional because it allows for on-going, random searches. This is because even where there are "special needs" for the privacy intrusion, a court "must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler, 320 U.S. at 314.

In analyzing the competing interests advanced by the parties in this case, the Court finds it important to start at the beginning – the reason for the enactment of the random drug policy in the first place. At trial, Dr. Lewis testified that Ms. Massey's arrest suggested that there could be a drug problem among teachers, and the School Board wanted to deter the problem, or, as Mr. Yeoman colorfully put it, "nip this in the bud."

The Court finds that deterring illegal drug use, including the unlawful use of prescription drugs, is a reasonable and appropriate objective and interest of the School Board and is supported by the record in this case. After all, as Knox County teaches, "few governmental interests are more important to a community than that of insuring the safety and security of its children while they are

entrusted to the care of teachers and administrators." <u>Knox County</u>, 158 F.3d at 374-75. The concern for children's safety remains the same whether the threat is illegal drugs or unlawful prescription use since children may be no less at risk from a teacher using cocaine than from a teacher unlawfully abusing prescription oxycodone bought off the street.

However, a policy enacted to address unlawful drug use, whether illegal or prescription drugs, must give constitutionally adequate notice and must be implemented with due regard for the privacy rights of teachers to be "reasonable" for purposes of the Fourth Amendment. In this case, the policies adopted by the School Board have not been clear in their wording or their implementation. This has resulted in "unreasonable" searches of the Plaintiffs in violation of their Fourth Amendment rights.

As initially written, the 2004 policy contained no randomness component, with the only explanation for the omission being that there was an oversight. Nevertheless, the Board required random testing from the start, and decreed that 10% of the employees would be randomly tested; but, curiously, during training sessions, employees were provided with slides which indicated that there would be no random drug testing.

Further, even though the policy specifically calls for testing only five types of drugs, the actual testing covers nine categories of drugs.[11] To this day, some School Board members have little or no idea of what drugs are included under the policy they approved. <u>See</u> <u>Knox County</u>, 158 F.3d at 381 (indicating that the Knox County policy specifically identified in its policy all of the drugs subject to testing).

---

[11]Additionally, in the slides presented at the training sessions, Smith County employees are not given sufficient information in terms of the drugs which are actually subject to being tested, and no indication of the street names or brand names of prescription drugs which are subject to testing.

The fact that urine was (and is) tested for drugs not even listed in the policy makes the policy constitutionally unclear and an unreasonable search. The policy must identify the drugs to be tested in such a way that it gives reasonable notice to lay teachers. This may, for instance, require notice of the common names or brand names of drugs and not just their scientific names.

Moreover, the policy specifically provides that it is a violation for any employee to report to work "while possessing in his/her body, blood, or urine, illegal drugs *in any detectable amount*." (Tr. Ex. 4, 2007 Policy, ¶ III B 2)(emphasis added). Such language in a policy makes the policy "remarkably intrusive." <u>Jones v. Graham County Bd. of Educ.</u>, 677 S.E.2d 171, 180 (N.C. App. 2009). The "any detectable amount" language is even more problematic in this case because actual cut-offs are being used by Fortier, but the teachers are not aware of those cut-offs. Plaintiffs are entitled to clear notice of the standards and cut-offs being used.

Apart from the foregoing ambiguities in the policy and its implementation, the policy lacks many of the details of the policy at issue in <u>Knox County</u>. The discretion afforded to Fortier extends not only to the drugs which are the subject of testing, but also to how the actual testing will occur. In contrast, and just by way of examples, the Board in Knox County designated the MRO, and the policy specified how urine specimens were to be collected and what types of tests were to be performed on the urine. Indeed, a previous 1991 Knox County policy was found to be unconstitutional by the district court because the policy, as written, "did not describe the methods or procedures to be followed in obtaining or testing urine samples, nor did it assure the employee applicants that their privacy interests in the results would be protected." <u>Knox County</u>, 158 F.3d at 365. Although the record suggests that Fortier generally follows industry standards in its testing procedure, there is no guarantee that the policy will continue to be enforced as it has, or, in fact, that

Fortier will always be the company making the decisions regarding which drugs to test for, and how the testing is to be done.  Again, Plaintiffs are entitled to clear notice of the what practices are to be used and that those practices are actually being used as announced for the search to be reasonable.

Finally, the testing process in this case appears more intrusive than in Knox County.  While few details are provided about the testing process in the Knox County opinion, there is no suggestion in that case that employees queued up as a group in a conference room to give samples, or that samples were split in front of others.  If, as the Supreme Court has indicated, "'[t]here are few activities in our society more personal or private than the passing of urine,'" and "if the collection . . . of urine intrudes upon expectations of privacy" Skinner, 489 U.S. at 617 (citation omitted), then a practice which allows for co-workers to be just outside the door when a sample is given, and for samples to be split in front of one's peers, surely raises additional privacy concerns.

Ultimately, of course, whether the policy in this case is broader or more intrusive than that addressed in Knox County is not determinative.  Rather, in addressing the constitutionality of the policy, the question is whether the school board has shown that its need for having the policy outweighs the privacy interests of its teachers.  Chandler, 520 U.S. at 314.

Unquestionably, ensuring the safety of children in school is a paramount and legitimate concern of the Smith County School Board, and threats to that safety must be addressed, no matter the source.  On the other side of the issue, public school teachers are protected against unreasonable searches and seizures.  Having fully considered the record, the Court finds that the School Board has demonstrated a need for a drug policy and the need for random drug testing, but that the policy is constitutionally flawed by its lack of notice of what drugs are the subject of testing and how the policy is to be implemented.

Accordingly, and based upon all of the evidence, the Court finds that random suspicionless drug testing of Smith County teachers under the 2007 drug policy in its current form and implementation is unreasonably intrusive and violates the Fourth Amendment. In so holding, the Court is not finding that the random drug testing of Smith County teachers is unconstitutional *per se*. If the unconstitutional aspects of the 2007 Policy and its implementation are cured, the Court is of the opinion that the random drug testing will comply with the Fourth Amendment.

### III. CONCLUSION

On the basis of the foregoing, the Court finds that the 2007 drug policy as written and presently implemented by the Smith County School Board is unconstitutional and violates the individual Plaintiffs' rights under the Fourth Amendment to the United States Constitution. Because the Court finds in Plaintiffs' favor on their Fourth Amendment claim under the United States Constitution, their parallel claim under the Tennessee Constitution is moot.

Todd J. Campbell
United States District Judge